**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**SELVAIN MCQUEEN,**                                              **PLAINTIFF,**

**VS.**                              **CIVIL ACTION NO. 1:05CV258-P-D**

**CITY OF COLUMBUS, MISSISSIPPI;**
**CHIEF J.D. SANDERS, and MAYOR**
**JEFFREY RUPP, in Their Individual**
**Capacities,**                                              **DEFENDANTS.**

<u>**MEMORANDUM OPINION**</u>

These matters come before the court upon Defendants' Motion for Summary Judgment [70-1] and Motion to Strike [86-1]. After due consideration of the motions and the responses filed thereto, the court is prepared to rule.

**I. FACTUAL BACKGROUND**

For the sake of clarity the court will relate the factual background of this case in chronological order, drawing from the facts alleged in the Second Amended Complaint as well as the briefs in support and in opposition to the instant motion for summary judgment.

Selvain McQueen, a black man, was hired as a police officer for the Columbus, Mississippi police department in January 1988. Around twelve years later, Chief Donald Freshour appointed McQueen as commander of the police department's Criminal Investigation Division ("CID") on February 24, 1999. Shortly thereafter Chief Freshour resigned as chief on March 8, 1999. Freshour pled guilty to embezzlement in federal court having misappropriated Crimestopper funds.

In April 1999 Billy Pickens, a white man, was appointed as the new chief of police. About six months later on October 7, 1999, Chief Pickens removed McQueen as CID commander and

reassigned him as the juvenile officer, officer manager, and evidence custodian within the CID. McQueen retained his rank and rate of pay. Chief Pickens appointed Tom Thompson, a white man, as the new commander of the CID.

Also on October 7, 1999 McQueen filed his first internal grievance regarding his removal as the CID commander wherein McQueen stated: "I feel that I'm being moved for unjust reasons. This is unfair and demoralizing to me. I've run the Division effectively for over nine months, and can find no reason for the change." Exhibit "K" to Motion for Summary Judgment. McQueen made no reference to race in his grievance statement. On the same grievance form, Chief Pickens wrote:

> I have said publicly that I believe that the weakest link in the Police Department is in the Detective Division. I believe that the public deserves the best law enforcement that this department can provide. To accomplish this goal, it is my responsibility to place officers with the most knowledge and experience where they will best serve our community.

*Id.* Finally, Linda Moore, the personnel officer, wrote on the same grievance form: "It is Chief Picken's [sic] responsibility to operate the Police Department in the most effective manner possible. This includes the administrative assignment of personnel to positions within the department, as long as the rank and rate of pay do not change." *Id.*

On or about November 18, 1999 McQueen met with then Mayor George Wade who concluded there was no merit to the grievance but informed McQueen of his right to a review by the City Council. On December 21, 1999 the City Council gave notice to McQueen that they would hear his grievance. Thereafter the Mayor and the City Council denied McQueen's grievance.[1]

In July 2001, some nineteen months after the City Council denied McQueen's first grievance

---

[1] On or about April 4, 2001 McQueen claims he filed his first EEOC charge alleging racial discrimination based on training. However, it is undisputed that McQueen has no evidence that he filed this charge. Furthermore, the City avers that it did not receive notice of this EEOC Charge.

for being removed as CID commander by Chief Pickens, Jeffery Rupp was elected Mayor of Columbus. It is undisputed that Rupp had not been a party of City government prior to his election.

In 2003 Chief Pickens retired and Assistant Chief Joe Johnson, a black man, was named interim chief until a permanent replacement was named. On October 24, 2003 Interim Chief Johnson issued a memo to the police department naming McQueen as CID commander and transferring Lt. Thompson to the position of Shift Lieutenant. Current Mayor Robert Smith, a black man, elected August 25, 2006, who was a Councilman at the time, testified in his deposition that Interim Chief Johnson was told by the City Council not to make personnel changes and to keep the status quo in the department until a new, permanent chief was chosen. Exh. "R" to Motion for Summary Judgment; Robert Smith Dep. at 12-14. McQueen asserts that there was never a formal Council vote to that effect. In this regard former Councilman Smith stated further: "[W]e didn't take it to a vote but just in discussion said that they preferred that no promotions or anything would be made until permanent chief was hired." *Id*. 13:9-12.

On October 28, 2003, three days after Interim Chief Johnson sent out the memo announcing McQueen would once again be the CID commander, then Mayor Rupp met with Johnson, Lt. Thompson, and personnel director Linda Moore regarding Johnson's unauthorized promotion of McQueen. Rupp requested that Thompson remain as CID commander. Interim Chief Johnson then told McQueen that he would not be appointed as CID commander.

On October 29, 2003 McQueen filed his second internal grievance wherein he stated:

On October 24, 2003 I received a Memo from the office of Interim Chief Joe L. Johnson, Jr. stating that effective October 29, 2003 I would be the Lieutenant in charge of CID. It has come to my attention that on October 28, 2003 you made the decision to override his decision. According to Section 1996 WL 369495, opinion number 96-0331 Dated [sic] June 7, 1996 which reads that a police chief is in charge

of the day to day operations. It further states that the Board has no authority to make daily decisions which arise in the management of the police Department. I feel that I have been deprived of a position that was assigned to me by the Interim Chief of Police.

Exhibit "U" to Motion for Summary Judgment. In this second internal grievance, McQueen makes no mention of race.

On December 1, 2003 J.D. Sanders was hired as the new chief of police. In April 2004 Chief Sanders reassigned McQueen from CID to be the commander of the Community Oriented Police and Enforcement ("COPE") Division. According to Chief Sanders, he believed McQueen had no productive role in CID since he was apparently not actually performing investigations. After a decision to phase out the COPE division Chief Sanders reassigned McQueen to be the police department's liaison with the City's Building Inspection Department.

On April 27, 2004 McQueen filed his third internal grievance wherein he stated: "Chief Sanders is violating my First Amendment rights by retaliating against me for exercising Freedom of Speech. I shouldn't receive non-leadership assignments or be assigned to the building Inspection Department because I asked a City Councilman whether or not he had heard that I'd been moved." Exh. "W" to Motion for Summary Judgment. On the same grievance form, Chief Sanders wrote:

Lt. McQueen was not assigned because of any retaliation. First of all, the assignment to assist the Inspection Dept. was a very important part of our overall effort to clean up some neighborhoods. Secondly, Lt. McQueen requested in writing to be reassigned from CID in the first week of December. He was offered a shift leader's position and rejected it because he didn't want to wear a uniform. He then begrudgingly accepted leadership of the COPE unit. While serving as the COPE Supervisor, Lt. McQueen required too much supervision himself. Lt. McQueen has failed to demonstrate the ability to supervise or lead. This department has limited positions to try and satisfy every member's personal requests for leadership and supervisory positions. There are several officers who have displayed much better skills in supervisory capacities than Lt. McQueen. All assignments are based on an objective, non-biased assessment of individual skills, talents, and abilities. To this

4

point, Lt. McQueen has not demonstrated those kind [sic] of abilities in spite of training and counseling. The role of Chief of Police is to assign all personnel in positions where the city and its citizens, as well as, the department, receive the very best services available. The assignments of Lt. McQueen are in keeping with that principle. There has never been any attempt to retaliate for any actions Lt. McQueen may or may not have done for anything including the exercise of first amendment rights. However, if [illegible because of copier cutoff] ... about any personnel matter, prior to discussions with commanding officers, that is a clear violation of departmental policies. Lt. McQueen should consider learning policy relative to "chain of command" and adherence to general orders.

The Chief of Police has never, nor will ever, assign individual personnel to assignments outside their normal duties unless there is a clear and written stated objective.

Lt. McQueen would be better served to try and fit into the team effort and concept instead of trying to find and exploit [sic] conflict.

When Lt. McQueen earns a leadership position and demonstrates the ability to adequately and efficiently and effectively supervise other personnel, he will be considered for that kind of position.

*Id.*

With regard to this April 27, 2004 grievance, McQueen admitted in his deposition that he did not speak to the Councilman until after Chief Sanders transferred him from CID to be the liaison with the City's Building Inspection Department. Exhibit "C" to Motion for Summary Judgment; McQueen Dep. 100-101. Therefore, it is undisputed that McQueen admits that he was not in fact retaliated against for speaking to a Councilman regarding his transfer – which is the basis of McQueen's April 27, 2004 grievance.

On May 6, 2004 McQueen filed an EEOC Charge checking the boxes for "race" and "retaliation" wherein he alleged (quoted herein as corrected by McQueen in his handwriting over the typed words):

Since October 24, 2003, I have been subjected to different terms and conditions of

employment than my White co-workers; I have been assigned demeaning job tasks; I have been denied pay increases; I have been denied job duties which require taking a leadership role; and the Mayor refuses to respond to my grievances. I have been denied Due Process because the Mayor deprived me of a position on 10/24/2003 when he overrode Interim Chief Joe L. Johnson Jr.'s decision to place me in charge of CID. According to section 1996 WL 369495, Opinion Number 96-0331 Dated June 7, 1996 the Board has no authority to make daily decisions which arise in the management of the Police Department. The Chief is in charge of the day to day operations. I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because of my race, Black, in that I am being treated less favorable in all aspects of my Lieutenant position, than my White co-workers by the Chief of Police (White) and the Mayor (White).

Exh. "DD" to the Motion for Summary Judgment.

On May 11, 2004 McQueen met with Mayor Rupp to discuss the April 27, 2004 grievance. Rupp noted that Sanders had the discretion to assign his men and informed McQueen that his next step would be to go to the City Council.

On June 16, 2004 McQueen filed an Amendment to his May 6, 2004 EEOC charge stating that Chief Sanders had taken his unmarked car and gave him a marked car and "On 6-14-04 and 6-15-04, Chief Sanders further demoted me by ordering me to work for a Sergeant and also stripped me of my Command Authority and by stating that I could be treating as a Patrolman."

On July 20, 2004 McQueen had hearing before Council in executive session. McQueen avers that he told the city that "I feel if I were white, then we wouldn't be having this conversation. I would be in charge of [C]ID." The Council decided not to take action on the grievance at that time, and asked the Mayor and City Attorney Tommy Wallace to attempt mediation between Sanders and McQueen.

On 8/17/04 McQueen met for mediation with Mayor Rupp, Chief Sanders, and City Attorney Tommy Wallace. McQueen was asked to provided Sanders by August 20, 2004 a list of positions

McQueen was willing to accept. Rather than complying, on the same day McQueen sent a letter to the City Attorney stating that he wanted the Council to rule upon his grievance.

On 8/18/04 Sanders sent McQueen a memo reminding him of the agreement to provide a list of job positions he was willing to accept. On August 20, 2004, McQueen sent a letter to Sanders stating he wanted to be: (1) Commander of CID; (2) Commander of Internal Affairs; or (3) Commander of the Community Relations Division. On September 3, 2004 Sanders issued memo to all police personnel that effective September 7, 2004, McQueen would assume command of the Community Relations Division.

In early 2005 McQueen requested approval to attend a management training course that was not required for continued yearly certification training. Chief Sanders avers that he told McQueen the cost would not be reimbursed by the City, but if he wanted to attend at his own expense, he would receive his normal salary while away from work. When McQueen returned, he demanded reimbursement because he had discovered that a Columbus fireman had been reimbursed.

On July 5, 2005 McQueen filed a new EEOC Charge claiming he was denied reimbursement by Sanders in retaliation for the EEOC charge in 2004 and because of his race. In this EEOC Charge, McQueen checked the boxes for "race" and "retaliation." The particulars were:

On February 23, 2005, I submitted a request to attend a training class scheduled for May 16-20, 2005. On June 2, 2005, I was denied reimbursement for the training class with the above employer. I was retaliated against because I filed a previous charge (131-2004-03721). I have been employed since January 18, 1988. I am currently employed as Lieutenant in the Community Relations Div.

Training Officer Captain Frederick Shelton stated that Chief J.D. Sanders failed to provide an answer to my request. I then asked the Chief if I could attend the training class and he stated that my request had been shot down.

I believe that I have been discriminated against because of my race/black and in

retaliation in violation of Title VII of the Civil Rights Act of 1964 as amended, since: Fire Department Captain Mike Chandler (white) and I were the only two individuals to reach the Level Six Class. He was approved to attend the Level Six Class. On or about May 17, 2005, I found out that the Mayor and City Council had approved to pay Fire Captain Mike Chandler expenses for the same class that I requested to attend. I checked the City Councils [sic] agenda and found that my request didn't appear. I then attended the class at my own expense.

[Attachment :] I feel that by the Chief of Police (J.D. Sanders) not presenting my request for reimbursement to the Mayor and City Council and the Mayor and City Council not approving me to attend the level six class because the Chief had allegedly forgotten to submit my request, and later told me that my request had been shot down during a Department Head meeting, was in retaliation for my filing a previous charge of discrimination with the EEOC.

Exh. "GG" to the Motion for Summary Judgment.

On October 17, 2005 McQueen filed his Complaint against the City of Columbus alleging violations of Title VII and 42 U.S.C. § 1981.

On May 18, 2006 McQueen filed his Second Amended Complaint, adding individual Defendants J.D. Sanders and Mayor Jeffrey Rupp in their individual capacities for defamation arising from alleged defamatory comments during an executive session of the City Council in 2004.

The defendants filed the instant motion for summary judgment on October 31, 2006. On January 12, 2007 the defendants filed a motion to strike certain documents relied upon by the plaintiff in his response to the motion for summary judgment.

## II. DISCUSSION

### A. MOTION TO STRIKE

The defendants move to strike (1) the alleged transcript of a telephone conversation with Deana Vernon; (2) McQueen's December 14, 2006 Affidavit; and (3) plaintiff's testimony of the purported 1999 statements of deceased former Columbus City Councilman Jackie Ball. Because the

plaintiff concedes that the transcript of Deana Vernon is improper, which it most certainly is and should never have been cited by the plaintiff's counsel as evidence in this case, the court will turn to the remaining issues.

## 1. Plaintiff's December 14, 2006 Affidavit

On the same day the plaintiff filed his opposition response brief he executed an Affidavit attached thereto. In this Affidavit the plaintiff avers that it was not until December 2005 when he first learned of the defamatory statements against him made by Rupp and Sanders during the executive council session on August 7, 2004.

The defendants argue that this directly conflicts with McQueen's deposition testimony on August 1, 2006 during which he stated that Councilman Billy James told him about the comments when McQueen was at the Building Inspection Department. The defendants point out further that since McQueen was transferred from the position as liaison to the Building Inspection Department in September 2004, the latest Councilman James could have told McQueen about the defamatory statements would have been September 2004, not December 2005.

The defendants quote *S.W.S. Erectors Inc. v. Infax,* 72 F.3d 489, 495 (5th Cir. 1995) for the rule that "[i]t is well-settled that this court does not allow a party to defeat summary judgment using an affidavit that impeaches, without explanation, sworn testimony." In submitting the Affidavit, McQueen offered no explanation regarding the conflict.

In his response brief to the motion to strike, the plaintiff wrote:

Avoiding a brouhaha, this appears to be a simple error on the Plaintiff's part. The affidavit was to report his first encounter with Ms. Vernon about the defamatory statements, but it appears that Plaintiff spoke incorrectly and said 'first learned' instead of 'first discussed.' Since there is no significant prejudice or irreparable harm to Defendants, Plaintiff requests that he be allowed to correct the error and

apologizes for any inconvenience. As we are all human and make mistakes, Plaintiff would ask that he not be precluded from submitting a corrected affidavit reflecting the information intended.

The court notes that no such corrected affidavit has been filed. Since the plaintiff concedes that the subject affidavit – Exhibit 7 to the plaintiff's response in opposition to the motion for summary judgment – is inaccurate, the motion to strike that affidavit should be granted.

## 2. 1999 Statements of Councilman Jackie Ball, Deceased

In his opposition response the plaintiff submits his deposition testimony in which he discusses alleged statements made in 1999 by Councilman Jackie Ball, who died in June 2002, regarding the 1999 grievance McQueen filed after being removed as CID commander. More specifically, McQueen alleges in his deposition that during the City Council hearing in 1999 he mentioned race playing a role in his first removal as CID commander in 1999 to Councilman Jackie Ball who "If I'm not mistaken, he indicated that he thought that, I guess, race had something to do with it also." McQueen Dep. at 36-37.

The defendants move to strike this testimony as hearsay and as irrelevant under Fed. R. Evid. 402 since it involves 1999 events which are time-barred.

In his response to the motion to strike, the plaintiff argues that he is not offering the testimony to prove the truth of the matter asserted, but rather as the plaintiff's own recollection of what Jackie Ball said. The plaintiff also argues that his recollection can also be offered as a present sense impression or explanation of an event or condition pursuant to Fed. R. Evid. 803(1) or to show mental impressions pursuant to Fed. R. Evid. 801(3). The plaintiff wrote further: "That these ponderings touch on race issues is relevant, since the Plaintiff's treatment as a result of his race is an underlying issue in this case."

The testimony is clearly hearsay and appears to be proffered in order to prove the truth of the matter asserted.

The defendants are correct that Rule 803(1)'s exception for hearsay statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" does not apply because the alleged statements of Jackie Ball took place on December 21, 1999, over two months after the removal of the plaintiff as CID commander on October 7, 1999.

The defendants are also correct that Rule 803(3)'s exception for then existing mental, emotional, or physical condition does not apply. This rule allows a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed ...." To fall under the 803(3) state of mind exception, "(1) the statements must be contemporaneous with the ... event sought to be proven; (2) it must be shown that the declarant had no chance to reflect – that is, no time to fabricate or to misrepresent his thoughts; and (3) the statements must be shown to be relevant to an issue in the case. " *U.S. v. Newell*, 315 F.3d 510, 522 n. 27 (5th Cir. 2002) (citing with approval *U.S. v. Jackson*, 780 F.2d 1305, 1315 (7th Cir. 1986)). As discussed above, the subject hearsay statement was not made contemporaneously with the event sought to be proven. Furthermore, the alleged statements are not relevant in this case since they involved 1999 events that are time-barred in this action.

The plaintiff's testimony regarding what Jackie Ball's alleged statements regarding whether race had anything to do with the plaintiff's 1999 removal as commander of the CID are hereby stricken as irrelevant and as inadmissible hearsay.

## B. Summary Judgment Standards

## A. Summary Judgment

Summary judgment should be entered only if "[t]here is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003). The party seeking summary judgment has the initial burden of demonstrating through the evidentiary materials that there is no actual dispute as to any material fact in the case. *Celotex Corp. v. Catrett*, 477 U.S. 3l7, 323 (l986). On motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (l986). In determining whether this burden has been met, the court should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id*. Furthermore, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The summary judgment procedure does not authorize trial by affidavit. Rather, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. Accordingly, a court may not decide any factual

issues found in the record on motion for summary judgment, but if such material issues are present, the court must deny the motion and proceed to trial. *Impossible Elec. Tech. v. Wackenhut Protection Systems*, 669 F.2d 1026, 1031 (5th Cir. 1982); *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981); *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).

Under the provisions of Federal Rule of Civil Procedure 56(e), a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

Summary judgment is not proper if a dispute about a material fact is "genuine," or in other words the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. There is no such issue unless the evidence sufficiently supports the non-moving party's version of the facts for a jury to return a verdict in the non-moving party's favor. *Id*. at 249. The relevant inquiry is whether or not there is sufficient disagreement on the facts to submit them to the jury or whether it is so one-sided that one party should prevail as a matter of law. *Id*. at 251. The issue must be genuine, and not pretended, and the evidence relied on to create such an issue must be substantial. *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 826 (5th Cir. 1978).

**B. Causes of Action**

It is difficult to ascertain with certainty the causes of action the plaintiff alleges in his Second Amended Complaint. The defendants argue that the Second Amended Complaint only levies claims of Title VII retaliation and state law claims for defamation, and not a claim for race discrimination.

The plaintiff in his opposition brief to the motion for summary judgment argues that there is a race discrimination claim in addition to retaliation and defamation. The plaintiff cites to *St. Paul Mercury Insurance Co. v. Williamson*, 224 F.3d 425, 434-5 (5th Cir. 2000) for the proposition that Fed. R. Civ. P. 8 provides a very liberal pleading standard and that the plaintiff need not plead legal theories.

Having considered the matter in light of Fed. R. Civ. P. 8's liberal pleading policy, the court concludes that the plaintiff has indeed alleged claims of retaliation, defamation, and race discrimination. Though the Second Amended Complaint is nebulous regarding a specific race discrimination claim – an error that plaintiff's counsel, who is highly experienced in employment discrimination litigation, could have avoided easily – the court concludes that there is enough language in the Second Amended Complaint as well as the two EEOC charges, both of which checked the boxes for "race" and "retaliation," to give fair notice to the defendants that race discrimination is involved. For example, in paragraph 7 of the Second Amended Complaint, the plaintiff wrote: "[T]he day a new police chief was appointed, Plaintiff was removed from this position as head of the criminal investigation division and replaced by a white person." In paragraph 15 the plaintiff wrote: "Plaintiff has been removed from the head of the criminal investigation division because he filed EEOC charges and internal grievances and because of his good faith belief that he had been racially discriminated against." Moreover, the overall tenor of the circumstances, as related by the plaintiff, involve allegations of race discrimination.

## C. Title VII Retaliation

"Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington Northern & Santa Fe Rwy. Co. v. White*, 126 S.Ct. 2405, 2411 (2006) (citing 42 U.S.C. § 2000e-3(a)). "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EOOC,' the courts, and their employers." *Id*. (internal citations omitted).

"The elements of a Title VII retaliation claim are: 1) the plaintiff participated in statutorily protected activity; 2) he received an adverse employment action; and 3) a causal connection exists between the protected activity and the adverse action." *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500, 506-07 (5th Cir. 2002).

"[O]nce the plaintiff establishes a prima facie case of unlawful retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Finally, the plaintiff must then 'adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation.'" *Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001) (internal citations omitted).

The plaintiff has not clearly delineated exactly the retaliatory events he alleges occurred. What follows is the court's opinion regarding the alleged events, keeping in mind that on no occasion was the plaintiff's rank or pay lowered.

The first retaliation event arose in 1999 when the plaintiff was initially removed as CID commander. More specifically, on October 7, 1999 then Chief Billy Pickens removed the plaintiff as CID commander and reassigned him as the juvenile officer, officer manager, and evidence custodian within the CID. Chief Pickens appointed Tom Thompson, a white man, as the new commander. On the same day he was removed as commander, the plaintiff filed his first grievance which did not mention race. On December 21, 1999 the Mayor and City Council denied the grievance. Though the plaintiff alleges he filed an EEOC Charge regarding this event, he concedes that he has no proof that he ever filed it. Thus, the court will assume that no such EEOC Charge was filed. In any event, it is undisputed that any claims based on these 1999 events are time-barred pursuant to 42 U.S.C. § 2000e-5(e)(1) which requires an action to be filed 180 days after the employment action occurred. The original complaint in this action was not filed until October 17, 2005 – almost six years after the allegedly retaliatory event. Furthermore, any claims based 1999 events raised under § 1981 or § 1983 are likewise time-barred since the statute of limitations for those statutes are four years and three years, respectively.

The second retaliation event allegedly arose in 2003. On October 24, 2003 Interim Chief Joe Johnson sent a memo stating that the plaintiff was to be reappointed as CID commander. On October 28, 2003 then Mayor Rupp met with Interim Chief Johnson, Lt. Tom Thompson (then CID commander) and Linda Moore, the police department's personnel director, regarding Johnson's unauthorized action since the City Council and the Mayor told Johnson not to make any personnel decisions given that he was an interim chief and such decisions would be reserved until a permanent chief was chosen. As a result, Interim Chief Johnson told the plaintiff he would not be the commander of CID. The plaintiff filed his second internal grievance on the next day. As discussed

above, although the plaintiff disputes that such a policy regarding personnel decisions was not officially voted upon during a session of the City Council, he does not dispute that such an agreement had been made among the Council, the Mayor, and Interim Chief Johnson.

With regard to this second retaliation event, it is unclear what protected activity for which the plaintiff alleges he was retaliated against by the defendants. In other words, he did not file a grievance regarding the cancellation of his reappointment as CID commander until after the event. Nor had he filed an EEOC Charge before the cancellation. The only possible protected activity occurring before the cancellation was the 1999 grievance the plaintiff filed for his initial removal as CID commander. As concluded above, any claims based on 1999 events are time-barred. Therefore, the court concludes that a Title VII retaliation claim cannot lie for the October 2003 cancellation of Interim Chief Johnson's reappointment of the plaintiff as CID commander.

The third retaliation event occurred after Chief J.D. Sanders was appointed chief in December 2003. In April 2004, Chief Sanders determined that in his opinion the plaintiff did not actually contribute to the CID and therefore reassigned him from CID to be commander of the Community Oriented Police & Enforcement (COPE) Department. When COPE was phased out shortly thereafter, Chief Sanders reassigned the plaintiff as the liaison to the City's Building Inspection Department. On April 27, 2004 McQueen filed his third internal grievance, claiming that Sanders retaliated against him because he spoke to a Councilman after he was reassigned to the Building Inspection Department. This retaliation cannot lie simply because the third grievance was filed *after* the plaintiff spoke to the Councilman.

The fourth retaliation event is less clear. On May 6, 2004 the plaintiff filed an EEOC Charge

checking the box for "race" and "retaliation" in which he alleged he was deprived of being reappointed as CID commander by Interim Chief Johnson in October 2003 because of racial discrimination and the previously filed grievances. The plaintiff filed an Amendment to the EEOC Charge on June 16, 2004 stating that Sanders further retaliated against him by taking his unmarked unit and making him work for a Sergeant. On July 20, 2004 during a hearing before the City Council regarding the cancellation of his reappointment as CID commander by Interim Chief Johnson, the plaintiff alleged that if he were white he would be in charge of CID. A month later on August 20, 2004 the plaintiff sent a reply to Chief Sanders' letter that had asked the plaintiff which three positions he would want. The reply stated that the plaintiff wished to be (1) commander of CID; (2) commander of Internal Affairs; or (3) commander of Community Relations. On September 3, 2004, Chief Sanders appointed the plaintiff as the commander of Community Relations.

Presumably, the alleged protected activity is the filing of the May 6, 2004 EEOC Charge and the Amendment filed thereto and the plaintiff's statement at the Council meeting that he would be the CID commander if he were white. The court notes that the actual substance of the May 6, 2004 EEOC Charge is without legal merit given the conclusions discussed above. The alleged retaliatory act in this instance is presumably when the plaintiff was given the position of commander of Community Relations instead of the first two choices. With regard to the adverse employment action requirement to establish Title VII retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington*, 126 S.Ct. at 2415 (internal citations omitted). The "provision's standard for judging harm must be objective." *Id.* The court concludes that objectively speaking,

receiving a command position requested, albeit the third of three requested positions, cannot be a materially adverse employment action.

The fifth retaliation event involves the 2005 training session. In early 2005 McQueen requested approval to attend a management training course that was not required for continued yearly certification training. It is undisputed that Chief Sanders told McQueen the cost would not be reimbursed by the City, but if he wanted to attend at his own expense, he would receive his normal salary while away from work. When McQueen returned, he demanded reimbursement because a fireman had been reimbursed. After Chief Sanders denied reimbursement, McQueen filed a EEOC Charge on July 5, 2005 alleging he was denied reimbursement by Sanders in retaliation for his May 6, 2004 EEOC charge and because of his race.

It is undisputed that Chief Sanders, as the chief of the Columbus Police Department, is not responsible for deciding whether or not to reimburse a fireman for a training session. It is also undisputed that Chief Sanders told the plaintiff before he went to the training session that he would not be reimbursed but that he could go while still being paid his regular salary. These two undisputed facts make it illogical to conclude that not being reimbursed was retaliation for prior grievances, EEOC Charges, or race. Furthermore, the July 5, 2005 EEOC Charge alleges retaliation for an EEOC Charge filed more than a year before. This long period makes it highly unlikely that retaliation occurred. *Raggs v. Miss. Power & Light*, 278 F.3d 463, 471-72 (5th Cir. 2002) (5 month lapse insufficient to show retaliation); Grizzle *v. Travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994) (10 months between protected activity and alleged retaliation highly unlikely to support causation element). Accordingly, the court concludes that the a retaliation claim cannot lie as a matter of law regarding the 2005 training session since the plaintiff cannot demonstrate the causation

requirement.

Given the analysis above, the court concludes that the plaintiff cannot establish his retaliation claims as a matter of law because he cannot establish at least one of the required elements for each retaliation event. With regard to all five retaliation events, he fails to meet the third element of a retaliation claim – *i.e.*, that a causal connection exists between the protected activity and the adverse action. This is because the timing does not lend itself to showing that each retaliation event was proximately caused by a valid protected activity. As to the fourth retaliation event, the plaintiff can establish neither the causation element nor the adverse employment action element.

## D. Race Discrimination

As discussed above, although the Second Amended Complaint is not a model of clarity, the court has allowed the plaintiff to proceed with his race discrimination claim since the Second Amended Complaint and the EEOC Charges allege race to be a causative factor in the injuries pled.

Title VII prohibits discrimination based on race. 42 U.S.C. § 2000e-2(a). "Title VII discrimination can be established through either direct or circumstantial evidence" and when a case is based on circumstantial evidence, the court should look to the *McDonnell Douglas* test. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

"Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination." *Laxton*, 333 F.3d at 578. (internal citations omitted). A prima facie case of race discrimination requires proof from the plaintiff that he was (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated. *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973); *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir.

2005).

If the court concludes that the plaintiff can establish a prima facie case of race discrimination, the second stage of the *McDonnell Douglas* requires the defendant to proffer a legitimate, nondiscriminatory reason for the plaintiff's termination. If the employer does so, the presumption of discrimination dissipates. *Laxton*, 333 F.3d at 578. The burden is placed back upon the plaintiff to demonstrate the third stage of the *McDonnell Douglas* test.

The third stage of the *McDonnell Douglas* test requires that "[t]he plaintiff ... bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against h[im] because of h[is] protected status." *Laxton*, 333 F.3d at 578. (internal citations omitted). In other words, if the plaintiff succeeds in demonstrating a *prima facie* case of discrimination, and if the employer proffers a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove that the non-discriminatory reason given by the employer was a pretext, or excuse, for discrimination.

With regard to direct evidence of racial discrimination, the plaintiff alleges that the City has admitted through the deposition testimony of one of its Councilmen, Kamal Kerriem, that the plaintiff's replacement by Tom Thompson for the CID commander position in 1999 was racially motivated. The defendants point out that Kerriem was defeated for reelection in June 2005 and thus, at the time of his deposition on August 31, 2006, he was no longer an employee of the City and therefore his statements cannot be deemed party admissions. The allegations of Karriem, by themselves, are insufficient to prove race discrimination *vel non* which is the plaintiff's ultimate burden.

The plaintiff argues that even without direct evidence, he has the circumstantial evidence to

meet his burden under the *McDonald Douglas* burden-shifting test for racial discrimination.

According to his opposition brief, the plaintiff maintains that he meets all of the elements for a *prima facie* case because (1) he is a member of a protected class because he is black, (2) it is undisputed that he was qualified for his position; (3) he suffered adverse employment actions by not being the CID commander, by being given duties that were beneath his rank, and by eventually being removed from CID altogether; and (4) he was treated differently from others similarly situated because he was replaced by a white person, Tom Thompson, as CID commander.

What was not mentioned in the plaintiff's opposition brief was the theory that he was racially discriminated against by the Chief Sanders and/or the City's refusal to reimburse him for the 2005 training session. His July 7, 2005 EEOC Charge checked the box for "race" in addition to "retaliation" regarding the refusal to reimburse him for the training session and specifically alleged that he was not reimbursed even though the white fireman had been reimbursed. Under the provisions of Federal Rule of Civil Procedure 56(e), however, a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. Since the plaintiff did not advance evidence or argument regarding racial discrimination in the denial of reimbursement in 2005, summary judgment must be granted on this ground alone.

Nevertheless, the plaintiff cannot establish a *prima facie* case of racial discrimination with regard to the 2005 training session or the other alleged events of racial discrimination – events, like those alleged establishing retaliation, that are not clearly delineated in the Second Amended Complaint nor in the plaintiff's opposition brief.

Given the chronological circumstances in this case, the plaintiff's complaints center around the 1999 removal of the plaintiff as CID commander. As discussed above, any such claims under Title VII or § 1981 based on 1999 events are time-barred. Therefore, the plaintiff cannot establish the fourth element that a similarly situated person was treated differently – *i.e.*, that Tom Thomspon, who is white, was given the CID commander position. This is because Tom Thompson was appointed in 1999. In 2003, when Interim Chief Johnson announced that he would replace Thompson with the plaintiff, Thompson was already the CID commander and was never formally reappointed over the plaintiff since Thompson was never formally removed. With regard to the other alleged adverse employment actions, the plaintiff does not point to evidence that there were other similarly situated people who were a race other than black that were treated differently in the same circumstances. Finally, the defendants dispute the plaintiff's assertion that he was qualified for the CID commander position. They point to the reasoning by Chief Sanders that the plaintiff was not an effective member of the CID and that Tom Thompson had seven more years of experience than the plaintiff.

Accordingly, because the plaintiff cannot establish a *prima facie* case of race discrimination, the court need not proceed to the next two steps of the *McDonald Douglas* burden-shifting test for racial discrimination.

## E. Defamation

Because the court is of the opinion that the plaintiff's federal claims should be dismissed with prejudice, the only remaining claims are those for defamation under Mississippi law against Jeffery Rupp and J.D. Sanders. The court declines to exercise supplemental jurisdiction over the defamation claims pursuant to 28 U.S.C. § 1367(c)(3). Therefore, the defamation claims should be dismissed

without prejudice.

### III. CONCLUSION

For the reasons discussed above, the court finds that Defendants' Motion to Strike [86-1] should be granted and that Motion for Summary Judgment [70-1] should be granted insofar as the plaintiff's federal claims for retaliation and racial discrimination should be dismissed with prejudice while the plaintiff's state-law claims for defamation should be dismissed without prejudice because this court declines to exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, a Final Judgment shall issue forthwith,

**THIS DAY** of February 23, 2007.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE